## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| APEX CLEARING CORP., | |
| Plaintiff and Counter-Defendant, | C.A. No. 19-2066-MN |
| v. | JURY TRIAL DEMANDED |
| AXOS FINANCIAL, INC. AND AXOS CLEARING LLC, | **PUBLIC VERSION OF D.I. 105 FILED: JULY 20, 2021** |
| Defendants and Counterclaimants. | |
| AXOS BANK, | |
| Plaintiff, | |
| v. | C.A. No. 20-18-MN |
| APEX CLEARING CORPORATION, | JURY TRIAL DEMANDED |
| Defendant. | **PUBLIC VERSION OF D.I. 105 FILED: JULY 20, 2021** |

**DEFENDANTS AND COUNTERCLAIMANTS AXOS FINANCIAL, INC. AND AXOS CLEARING LLC'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

SUMMARY ...........................................................................................................................1

ARGUMENT .........................................................................................................................3

    A.    Standard of Review.......................................................................................3

    B.    Defendants are Entitled to Summary Judgment on All Claims and Counterclaims Because Defendants' Use of Defendants' Marks Does Not Infringe Plaintiff's Marks as a Matter of Law. ......................................................................................4

        1.    Plaintiff's Marks Are Not Similar...............................................................5

        2.    Plaintiff's Marks Are Entitled to Limited Protection ..................................8

        3.    The Parties' Consumers are Sophisticated and Understand the Relationship Between the Parties and Their Services..............................11

        4.    The Parties Use Highly Targeted Channels to Market Their Goods & Services Under Their Respective Marks....................................................14

        5.    There is No Evidence of Actual Confusion After Almost Three Years of Concurrent Use .......................................................................................15

        6.    Defendants Acted in Good Faith...............................................................16

        7.    Balance of Factors Weighs in Favor of No Likelihood of Confusion .......18

    C.    Defendants are Entitled to Summary Judgment on the Issue of Actual Damages Because Plaintiff Has Not Identified Any Past or Present Monetary or Reputational Harm Suffered as a Result of Defendants' Use and Promotion of Defendants' Marks..................................................................................................18

    D.    Defendants are Entitled to Summary Judgment on the Issue of Disgorgement Because Plaintiff Has Not Made A Preliminary Showing that Disgorgement is Warranted...................................................................................................19

CONCLUSION....................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
    237 F.3d 198 (3d Cir. 2000)...................................................................................5, 9

*Accenture Glob. Servs. GMBH v. Guidewire Software Inc.*,
    581 F. Supp. 2d 654 (D. Del. 2008)...................................................................................4

*ACCU Pers., Inc. v. AccuStaff, Inc.*,
    846 F. Supp. 1191 (D. Del. 1994)................................................................................18, 19

*Bijur Lubricating Corp. v. Devco Corp.*,
    332 F. Supp. 2d 722 (D.N.J. 2004) .............................................................................5, 18

*Caesars World, Inc. v. Venus Lounge, Inc.*,
    520 F.2d 269 (3d Cir. 1975)........................................................................................18, 19

*Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc.*,
    333 F. Supp. 2d 239 (D. Del. 2004), *aff'd in part sub nom. Freedom Card,*
    *Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463 (3d Cir. 2005)........................................ *passim*

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*,
    269 F.3d 270 (3d Cir. 2001).......................................................................................... *passim*

*CollegeSource, Inc. v. AcademyOne, Inc.*,
    597 F. App'x 116 (3d Cir. 2015) ..........................................................................................3

*Com. Bancorp, Inc. v. BankAtlantic*,
    285 F. Supp. 2d 475 (D.N.J. 2003) .....................................................................................11

*Componentone, L.L.C. v. Componentart, Inc.*,
    No. 02: 05CV1122, 2008 WL 4790661 (W.D. Pa. Oct. 27, 2008)........................................15

*Covertech Fabricating, Inc. v. TVM Bldg. Prod., Inc.*,
    855 F.3d 163 (3d Cir. 2017)................................................................................................18

*First Nat. Bank in Sioux Falls v. First Nat. Bank, S. Dakota*,
    153 F.3d 885 (8th Cir. 1998) ..............................................................................................12

*GOLO, LLC v. Goli Nutrition Inc.*,
    No. CV 20-667-RGA, 2020 WL 5203601 (D. Del. Sept. 1, 2020) ....................................5, 8

*Gucci Am., Inc. v. Daffy's Inc.*,
    354 F.3d 228 (3d Cir. 2003)................................................................................................19

*Harp v. Rahme*,
    984 F. Supp. 2d 398 (E.D. Pa. 2013), *aff'd* (Aug. 13, 2014) .............................................11, 18

*Int'l Data Grp., Inc. v. Ziff Davis Media, Inc.*,
    145 F. Supp. 2d 422 (D. Del. 2001) ................................................................................9, 17

*Interpace Corp. v. Lapp, Inc.*,
    721 F.2d 460 (3d Cir. 1983) .................................................................................... *passim*

*InterState Net Bank v. NETB@NK, Inc.*,
    348 F. Supp. 2d 340 (D.N.J. 2004) ...................................................................................8

*Kinbook, LLC v. Microsoft Corp.*,
    866 F. Supp. 2d 453 (E.D. Pa. 2012) ..............................................................................18

*Toro Co. v. Textron, Inc.*,
    499 F. Supp. 241 (D. Del. 1980) ......................................................................................4

*UHS of Del., Inc. v. United Health Servs., Inc.*,
    227 F. Supp. 3d 381 (M.D. Pa. 2016) ...............................................................................9

*VeriFone, Inc. v. Poynt Co.*,
    199 F. Supp. 3d 898 (D. Del. 2016) ................................................................................11

*Versa Prod. Co. v. Bifold Co. (Mfg.)*,
    50 F.3d 189 (3d Cir. 1995) .......................................................................................12, 15

*Zaletel v. Prisma Labs, Inc.*,
    No. CV 16-1307-SLR, 2017 WL 877302 (D. Del. Mar. 6, 2017) .....................................6, 15

**Statutes**

6 *Del. C.* § 2532(a) ..................................................................................................................4

6 *Del. C.* § 2533 .......................................................................................................................

15 U.S.C. §§ 1057(b), 1115(a) ...............................................................................................10

15 U.S.C. § 1114(1) .................................................................................................................4

15 U.S.C. § 1117 ....................................................................................................................18

15 U.S.C. § 1125(a) .................................................................................................................4

**Other Authorities**

Fed. R. Civ. P. 56 ................................................................................................................1, 2

3 McCarthy on Trademarks and Unfair Competition § 30:59 (5th ed.) ............................19

## <u>SUMMARY</u>

Defendants and Counterclaimants Axos Financial, Inc. ("Axos Financial") and Axos Clearing LLC ("Axos Clearing") (collectively, "Defendants"), by and through their undersigned counsel, respectfully submit this brief in support of their motion for summary judgment ("Motion") filed pursuant to Fed. R. Civ. P. 56, seeking an order granting summary judgment against Apex Clearing Corporation ("Plaintiff" or "Apex Clearing") on all claims contained in Plaintiff's First Amended Complaint (D.I. 48) and all counterclaims contained in Defendants' Answer to First Amended Complaint, Affirmative Defenses, and Counterclaims (D.I. 69).  Each of Plaintiff's claims, and Defendants' declaratory judgment counterclaims, requires a showing of likelihood of confusion between the parties' respective trademarks, which cannot be made here.

This is a trademark infringement case about a stylized X that appears in two contexts:

 

Plaintiff bases its claims on a different stylized X that appears in its logos:

[1]

---

[1] Plaintiff only adopted this version with the vertical line removed after filing the Complaint.  First Am. Compl. (D.I. 48) ("FAC") at 3-4, ¶ 12.

This case is not about the words AXOS CLEARING or APEX CLEARING, or even AXOS or APEX. This case is also not broadly about use of a stylized X. On the contrary, this case relates to the clearing and custody industry, *i.e.*, settling transactions, handling buy and sell orders, and maintaining custody of account owners' securities and other assets, and the sophisticated entities who use those services.

Axos Financial is the holding company for Axos Clearing and Axos Bank, a federally-chartered bank, among others. (Fact 1.)[2] Axos Clearing provides comprehensive securities clearing services to introducing broker-dealers and registered investment advisor ("RIA") correspondents ("Axos Clearing's Goods & Services"). (Fact 4.) Plaintiff is a subsidiary of PEAK6, a holding company. (Fact 9.) Plaintiff is a securities clearing firm that provides digital wealth management solutions, including clearing and settlement services. (*Id.*)

Defendants are entitled to summary judgment on all of the claims and counterclaims because Plaintiff's alleged marks are weak and entitled to a narrow scope of protection, as the parties' customers are sophisticated financial services entities and understand the relationship between the parties and their services; the parties' services are marketed in a highly targeted manner; Plaintiff's stylized "X" is not distinctive or a source identifier for Plaintiff where Plaintiff has not even used it in a standalone manner; Plaintiff's alleged marks have coexisted with a number of marks in the financial industry that incorporate the letter "X" and Plaintiff has taken no steps to enforce against those users; and, there has been not a single instance of confusion. Indeed, even after filing this lawsuit and knowing that Defendants' "X" marks incorporate a chevron (or greater-than sign) with two protruding lines, Plaintiff adopted and began using identical or substantially

---

[2] Reference to "Fact" numbers refer to Defendants' Concise Statement of Undisputed Facts filed in support of this Motion.

indistinguishable stylized "X" marks, with the very same greater-than sign and two protruding lines.

Finally, Defendants are entitled to summary judgment on the issue of actual damages because the undisputed material facts show that Plaintiff has not suffered any actual damages as a result of Defendants' alleged infringement. Moreover, even if liability were found, Plaintiff cannot make out a basis for the equitable remedy of disgorgement under these facts.

## **ARGUMENT**

### A.    **Standard of Review.**

"Summary judgment is appropriate where the movant establishes 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *CollegeSource, Inc. v. AcademyOne, Inc.*, 597 F. App'x 116, 122 (3d Cir. 2015) (citing Fed. R. Civ. P. 56(a)). As this Court has explained:

> In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. However, a court should not make credibility determinations or weigh the evidence. To defeat a motion for summary judgment, Rule 56(c) requires the non-moving party to do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment.

*Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc.*, 333 F. Supp. 2d 239, 243 (D. Del. 2004), *aff'd in part sub nom. Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463 (3d Cir. 2005) (cleaned up).

**B.     Defendants are Entitled to Summary Judgment on All Claims and Counterclaims Because Defendants' Use of Defendants' Marks Does Not Infringe Plaintiff's Marks as a Matter of Law.**

Plaintiff asserts claims for (i) trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1) (Claim 1), (ii) false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a) (Claims 2 & 3), and (iii) deceptive trade practices pursuant to Delaware law, specifically 6 *Del. C.* § 2532(a), the Delaware Uniform Deceptive Trade Practices Act ("DTPA") (Claims 4 & 5).  All of Plaintiff's claims require Plaintiff to make the same showings—(1) the existence of a mark which is valid and legally protectable; (2) that the mark is owned by the Plaintiff; and (3) the Defendants' use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services—and so require analysis of the same factors and considerations.[3] *See Chase*, 333 F. Supp. 2d at 244.  Defendants are also moving for summary judgment on their counterclaims, which seek a declaratory judgment of no violation on each of Plaintiff's affirmative claims, again implicating the same considerations and analyses.

The Third Circuit has enumerated the following factors to assist in determining whether a likelihood of confusion exists:

1. similarity of the marks;
2. the strength of the owner's mark;
3. the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
4. the length of time the defendant has used the mark without evidence of actual confusion;
5. the intent of the defendant in adopting the mark;
6. the evidence of actual confusion;

---

[3] In evaluating a claim under Section 2532, it is unnecessary to consider whether there is competition between the parties or whether there is actual confusion or misunderstanding.  Claims under the DTPA otherwise implicate the same considerations as claims under the Lanham Act, and Plaintiff "is entitled to no greater relief . . . for violation of the Deceptive Trade Practices Act than for violation of the Lanham Act."  *Toro Co. v. Textron, Inc.*, 499 F. Supp. 241, 249, n.17 (D. Del. 1980); *see also Accenture Glob. Servs. GMBH v. Guidewire Software Inc.*, 581 F. Supp. 2d 654, 668 (D. Del. 2008) (referencing prior analysis dismissing claims under the Lanham Act in dismissing claim under the DTPA).

7. whether the goods are marketed or advertised through the same channels;
8. the extent to which the targets of the parties' sales efforts are the same;
9. the relationship of the goods in the minds of consumers; and
10. other factors suggesting that the consuming public might expect the prior owner to manufacture both products, or manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

*Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983).  "[T]he *Lapp* test is a qualitative inquiry.  Not all factors will be relevant in all cases; further, the different factors may properly be accorded different weights depending on the particular factual setting.  A district court should utilize the factors that seem appropriate to a given situation."  *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 215 (3d Cir. 2000); *see also Bijur Lubricating Corp. v. Devco Corp.*, 332 F. Supp. 2d 722, 728 (D.N.J. 2004).

In this case, the differences in the marks; the lack of strength of Plaintiff's Alleged Marks; the ability of the parties' sophisticated consumers (*i.e.*, other financial services companies) to understand the relationship of the services being offered by each party; the highly targeted manner in which the parties' services are marketed; and the absence of a single instance of confusion over an almost three-year time period of concurrent use all compel a finding of no likelihood of confusion as a matter of law.

## 1.    Plaintiff's Marks Are Not Similar

In considering the first *Lapp* factor—the similarity of the marks—two marks are confusingly similar "if ordinary consumers would likely conclude that the two products share a common source, affiliation, connection or sponsorship."  *Id.* at 216.  Importantly, in making this comparison, a court is not to examine the two marks side-by-side and in a vacuum, but must instead "move into the mind of the roving consumer" to assess the total commercial impression of the marks as they appear on the products or services in the marketplace.  *Id.*; *see also GOLO, LLC v. Goli Nutrition Inc.*, No. CV 20-667-RGA, 2020 WL 5203601, at *4 (D. Del. Sept. 1, 2020) ("While

the words GOLO and Goli, on their own, are phonetically similar, similarity for the first *Lapp* factor is not determined merely by examining the GOLO and Goli marks in a vacuum, but rather by assessing the total commercial impression of each mark."); *Zaletel v. Prisma Labs, Inc.*, No. CV 16-1307-SLR, 2017 WL 877302, at *4 (D. Del. Mar. 6, 2017) ("Certainly there is a degree of similarity between the look and sound of the words 'Prizmia' and 'Prisma.'  The marketplace presents the two marks very differently, however, which distinct presentations create distinct commercial impressions.").  Here, the parties' marks are dissimilar.

First, the parties' marks are transparently different in context:



Plaintiff has only used a standalone stylized X "periodically."  (Fact 14.)  Plaintiff almost always uses its logo with "a PEAK6 company" written underneath "Apex Clearing," creating a clear affiliation with its parent holding company.  (Facts 9, 13.)  When examining the facial differences between the marks, the word "APEX" in APEX CLEARING is presented in all capital letters while "AXOS" in AXOS CLEARING is presented in lowercase letters.  Since at least 2016, APEX CLEARING has appeared on one line (FAC at 3, ¶ 11), whereas AXOS CLEARING is split so that CLEARING appears in smaller font below the dominant AXOS house-mark.  The

word "apex" signifies a peak, and is thus a play on Plaintiff's parent company's name PEAK6, while "axos" has no English meaning. (Fact 2.) These distinctions in presentation and meaning have the overall effect of creating a difference between the marks in the mind of the consumer.

Moreover, and as discussed in more detail in the motion for summary judgment filed concurrently in the Consolidated Case, C.A. No. 20-18-MN ("Consolidated Case"), Plaintiff adopted the identical or substantially indistinguishable stylized X and chevron to Axos' stylized X marks ("the Axos Stylized X Marks") in December 2019 ("Apex's Infringing Marks"):



| Axos Stylized X Marks | Apex's Infringing Marks |
|---|---|

(Facts 5-6, 8, 15.) Plaintiff has admitted it is not currently using any variation of Apex's Infringing Marks, which are at issue in the Consolidated Case. (Fact 17.) It is readily apparent that the stylized X in Apex's Infringing Marks is identical to or substantially indistinguishable from the stylized X in the Axos Stylized X Marks, meaning the stylized X in Plaintiff's current marks is not

merely a variation of, and is distinguishable from, that in the Axos Stylized X Marks. Indeed, Plaintiff's Chief Executive Officer admitted that Apex's Infringing Marks were "different" from the Alleged Marks. (Fact 15.)

Finally, although there are a multitude of third-party stylized X marks used by companies in the financial services industry, Plaintiff has never taken any enforcement actions, including sending demand letters, against any third-party regarding a stylized X mark. (Facts 41, 43.) In fact, Plaintiff's Chief Administrative Officer stated he "do[es]n't pay much attention to" whether third-parties use stylized X marks identical to Plaintiff's. (Fact 42.)

Numerous courts have found differences similar to those presented here sufficient to establish that there would be no likelihood of confusion between marks. *See GOLO, LLC*, 2020 WL 5203601, at *4 ("Here, I find that the GOLO and Goli marks are presented in a different fashion. For example . . . GOLO is presented in all capital letters, where the first syllable is green and the second syllable is blue. Goli is advertised in red or black block letters on its website, or white block letters on its product, with all letters lowercase."); *InterState Net Bank v. NETB@NK, Inc.*, 348 F. Supp. 2d 340, 354–55 (D.N.J. 2004) (finding no confusing similarity between NETBANK and INTERSTATE NET BANK where the parties used different fonts and the marks were "visibly different and distinct"). For these reasons, the first *Lapp* factor favors Defendants.

**2.      Plaintiff's Marks Are Entitled to Limited Protection**

The strength of a mark, the second factor of the *Lapp* test, is measured by "(1) the distinctiveness or conceptual strength of the mark and (2) the commercial strength or marketplace recognition of the mark. The first prong of this test looks to the inherent features of the mark; the second looks to factual evidence of 'marketplace recognition.'" *Chase*, 333 F. Supp. 2d at 247 (citing *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 478–79 (3d Cir. 1994)). The

weaker a mark, the lesser the protection to which it is entitled, diminishing any likelihood of confusion. *A & H*, 237 F.3d at 222.

As to the first prong, the "distinctiveness" or "inherent strength" of a mark "is measured by classifying the mark within one of four categories from the strongest to the weakest: (1) arbitrary or fanciful (such as KODAK); (2) suggestive (such as COPPERTONE); (3) descriptive (such as SECURITY CENTER); and (4) generic (such as DIET CHOCOLATE FUDGE SODA)." *Id.* Widespread use of a term or mark within a particular industry generally suggests that the mark is on the weaker end of this spectrum, indicating that there will be no likelihood of confusion within that industry. *See, e.g.*, *Int'l Data Grp., Inc. v. Ziff Davis Media, Inc.*, 145 F. Supp. 2d 422, 436 (D. Del. 2001) (finding no likelihood of confusion with mark "CIO Insider" in print materials where both "CIO" and "Insider" were widely used "in connection with magazines, newsletters, and columns by companies other than [plaintiff]"); *UHS of Del., Inc. v. United Health Servs., Inc.*, 227 F. Supp. 3d 381, 393 (M.D. Pa. 2016) (finding UHS mark not conceptually strong in light of "multiple third-party users of nearly identical marks in related healthcare markets," including three "nearly identical stylized marks" used by major healthcare service providers).

Here, the Alleged Marks are essentially word marks with a single stylized X component. But Plaintiff has not alleged a likelihood of confusion between the literal elements of the marks APEX and AXOS, or APEX CLEARING and AXOS CLEARING, and has only used the stylized X as a standalone element "periodically," indicating the stylized X is not a strong source indicator for Plaintiff. (Facts 14, 38.)

Further, there is widespread use of stylized X marks in the financial industry and Plaintiff has done nothing to enforce its purported stylized X mark against third-party uses. (Facts 41, 43.)

Evidence of third-party uses and registration of similar marks for related services is relevant to show that a mark is weak and entitled to only a narrow scope of protection.

Both parties have trademark registrations for marks with stylized X components, with Axos Bank having obtained its registration for the Axos Mark on December 24, 2019, and Plaintiff having obtained a registration for an Apex Clearing Mark with stylized X on July 21, 2020, almost a year after filing this lawsuit. (Facts 5, 11; FAC at 3-4, ¶ 12.) Defendants thus have prior federally registered rights in the Axos Mark with stylized X. Axos Bank's registration of the Axos Mark is valid and subsisting, and provides prima facie evidence of Defendants' right to use the Axos Mark in commerce. 15 U.S.C. §§ 1057(b), 1115(a). The coexistence on the USPTO Principal Register of the Axos Mark with stylized X and Plaintiff's subsequently registered APEX CLEARING mark with stylized X shows these marks are able to coexist in the marketplace without issue. For all of these reasons then, the stylized X component that Plaintiff seeks to enforce in its Alleged Marks is weak and unprotectable.

As to the second prong, in order to demonstrate that its mark has "commercial strength," it falls to the plaintiff to present evidence of, for example, "the amount of money that it spent on advertising, whether it took any steps to increase public recognition of [its] mark, and whether the public does, in fact, recognize its mark." *Chase*, 333 F. Supp. 2d at 248; *see also Freedom Card*, 432 F.3d at 472 ("In examining a mark's commercial strength, we examine marketplace recognition.").

Here, the parties' consumers are sophisticated financial services companies (e.g., broker-dealers and registered investment advisors), not the public at large or even retail investors. (Fact 22.) As discussed in more detail *infra*, the parties' services are specialized and any advertising is primarily limited to the parties' websites and social media. (Facts 26-27.) Many of the parties'

prospective consumers are already aware of the parties and their services.  (Fact 28.)  For these reasons, it is highly unlikely that Plaintiff's present or prospective consumers would understand that Plaintiff's purported stylized X refers to Plaintiff in the first place, let alone that the Axos Clearing Mark or Stand-Alone Blue X Mark signify Plaintiff and not Axos Clearing or Defendants' related company Axos Invest, respectively.  Accordingly, for all of these reasons, the second *Lapp* factor favors Defendants.

### 3.    The Parties' Consumers are Sophisticated and Understand the Relationship Between the Parties and Their Services

The third factor of the *Lapp* test, care and attention expected of consumers in making a purchase, weighs against a finding of likelihood of confusion.  The considerations discussed in this section also overlap with the eighth, ninth, and tenth *Lapp* factors, and so further weigh against a likelihood of confusion.  In particular, in considering the eighth *Lapp* factor, the "targets of sales efforts," where services are primarily provided online courts will find confusion unlikely in industries where consumers are likely to take special care in selecting services, such as the financial and banking industries.  *See Com. Bancorp, Inc. v. BankAtlantic*, 285 F. Supp. 2d 475, 496 (D.N.J. 2003) ("In other words, there is no overlap of provision of services in the bricks and mortar context, and to the extent that there may be overlap in the online context, the high degree of care involved in selecting financial and banking services may negate such an effect." ).[4]

---

[4]  As to the ninth *Lapp* factor, "[t]he test for determining the relationship of goods in the minds of consumers is whether the goods are similar enough that a consumer could assume they were associated with or offered by the same source.  'Near-identity' and 'similarity of function' are key to assessing whether consumers may see products as related. The closer the relationship between the products, the greater the likelihood of confusion."  *VeriFone, Inc. v. Poynt Co.*, 199 F. Supp. 3d 898, 911 (D. Del. 2016) (internal citations and quotations omitted).  The tenth *Lapp* factor is "highly context-specific," and generally considers "whether there is evidence to suggest that the markets of a trademark owner and alleged infringer overlap or are likely to converge."  *Harp v. Rahme*, 984 F. Supp. 2d 398, 419 (E.D. Pa. 2013), *aff'd* (Aug. 13, 2014).  As discussed in this

Where one would expect consumers to exercise heightened care in selecting between different providers of a service, or where that service is costly, courts generally find confusion to be highly unlikely. *See, e.g.*, *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 284 (3d Cir. 2001) ("When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion. Where the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations."); *Versa Prod. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 204–05 (3d Cir. 1995) ("The more important the use of a product, the more care that must be exercised in its selection. In addition, the degree of caution used depends on the relevant buying class. That is, some buyer classes, for example, professional buyers . . . will be held to a higher standard of care than others.") (internal citation and quotation omitted).

Numerous courts have found that there is no likelihood of confusion between the marks of parties providing banking and financial services, like those provided here, on the ground that these are services consumers take particular care in selecting. *See, e.g.*, *First Nat. Bank in Sioux Falls v. First Nat. Bank, S. Dakota*, 153 F.3d 885, 889–90 (8th Cir. 1998) ("We recognize that other courts have determined there to be minimal or no likelihood of confusion even where the names of financial institutions share the same dominant terms.") (collecting cases); *Chase*, 333 F. Supp. 2d at 248–49 ("Generally, consumers exercise a high degree of care in choosing banking services. As a result, customers are more likely to notice what, in other contexts, may be relatively minor differences in names.").

---

section, however, the parties' consumers are sophisticated and understand the relationship between the parties and their services.

Here, foremost, Plaintiff and Axos Clearing's customers[5] are sophisticated business clients familiar with the clearing and custody industry, namely, broker-dealers and RIAs. (Facts 4, 22.) The parties' customers are not individual retail investors (the end consumer). (Fact 22.) Clearing firms often operate behind-the-scenes to the retail investor who is unaware of the identity of the company transferring funds to the seller and securities to the buyer. (Fact 18.)[6] Axos Clearing has approximately sixty clients in total and negotiates prices with those clients on a client-by-client basis. (Fact 23-24.) Plaintiff has approximately 200 clients in total. (Fact 23.) While describing Plaintiff's pricing templates, William Brennan, Plaintiff's Chief Administrative Officer, testified that pricing can vary for each customer negotiation and that "there's multiple [pricing] templates because there's multiple, different types of clients that Apex has." (Fact 24.) Non-party Axos Invest, formerly known as WiseBanyan, was a customer of Plaintiff – not a competitor – and even remained a customer after its rebrand to Axos Invest in 2019. (Fact 34.)

The clearing and custody industry is dominated by a limited universe of providers, and there are significant barriers to entry given the regulatory oversight, sophisticated technology, and high capital requirements. (Fact 19.) The decision of a broker-dealer, RIA, or other asset manager to partner with a clearing firm is time-consuming for both the seller of the clearing and custody services as well as the buyer, who conducts a thorough analysis of the provider's capabilities and compatibility with the buyer's needs. (Fact 20.) The clearing firm's reputation and stability are important factors for prospective clients. (*Id.*) Clients looking for a clearing and custody provider tend to meet with a handful of providers before narrowing it down and having two firms pitch

---

[5] As a holding company, Axos Financial does not solicit customers of its own. (Fact 9.)

[6] On March 31, 2021, Defendants submitted the Expert Report of E. Bruce Mumford in which he discusses the clearing and custody industry, including the marketing and sales of clearing services. Plaintiff neither responded to this expert report nor engaged an expert to dispute any of the opinions.

against each other. (Fact 28.) To engage a new client, the clearing firm and the client must enter a clearing or custody agreement, a process that "typically goes three to six months." (Fact 20.) The relationship between the client and clearing firm can involve high switching costs and tends to be a multi-year relationship. (Fact 21.) The initial term for a clearing agreement is generally three years. (*Id.*) Considering these facts, there can be no question that the parties' clients exercise a high degree of care in selecting between clearing and custody providers.

For all these reasons, the third, eighth, ninth, and tenth *Lapp* factors favor Defendants.

4. **The Parties Use Highly Targeted Channels to Market Their Goods & Services Under Their Respective Marks**

"[T]he greater the similarity in advertising and marketing campaigns [for the products at issue], the greater the likelihood of confusion." *Checkpoint*, 269 F.3d at 288-89. In evaluating the seventh factor of the *Lapp* test, "courts must examine the trade exhibitions, publications and other media the parties use in marketing their products as well as the manner in which the parties use their sales forces to sell their products to consumers. This is a fact intensive inquiry." *Id.* at 289.

Here, the majority of the time the parties' services need not be promoted because they are already known among the narrow subset of sophisticated consumers. (Fact 28.) According to Mr. Brennan: "Oftentimes, I would say the majority of the time people know who Apex are. And if they are looking for a clearing platform, they will contact us directly." (*Id.*) Both Plaintiff and Axos Clearing engage in limited advertising primarily on their own websites and social media channels. (Facts 26-27.) Plaintiff also makes new contacts by attending conferences, cold calling, and scanning industry sites. (Fact 26.) Axos Clearing also makes new contacts through word-of-mouth, a traditional sales team, and email campaigns targeted at specific businesses. (Fact 28.) Clients looking for a clearing and custody provider tend to meet with a handful of providers before narrowing it down and having two firms pitch against each other. (Fact 28.) In sum, Plaintiff and

14

Axos Clearing use highly targeted channels to market their goods and services under their respective marks.

As stated above, Axos Financial does not solicit customers of its own. (Fact 7.) Non-party Axos Invest, which was formerly a customer of Plaintiff, engages in limited use of its Stand-Alone Blue X Mark, primarily on its mobile application used by its customers. (Fact 33.) Axos Invest once marketed on its own website and social media channels but ceased all marketing in 2020. (Fact 33.)

For all of these reasons, the seventh *Lapp* factor favors Defendants.

5.    **There is No Evidence of Actual Confusion After Almost Three Years of Concurrent Use**

"If a defendant's product has been sold for an appreciable period of time without evidence of actual confusion, one can infer that continued marketing will not lead to consumer confusion in the future. The longer the challenged product has been in use, the stronger this inference will be." *Versa*, 50 F.3d at 205; *see also Zaletel*, 2017 WL 877302, at *5 (finding no likelihood of confusion where product had been downloaded seventy million times and there was no evidence of actual confusion). Given that the marks have been in concurrent use for nearly three years with no evidence of actual confusion, both the fourth and the sixth factor of the *Lapp* test weigh against a finding of likelihood of confusion.

Scattered instances of apparent confusion will not suffice to establish actual confusion if they amount to *de minimis* evidence when considered in the full context of a party's business. *See Checkpoint*, 269 F.3d at 299 ("Given the size of these companies, and the large number of e-mails, customer inquiries, and other communications they receive on a daily basis, these isolated instances of initial interest confusion counsel against a finding of likely confusion."); *Componentone, L.L.C. v. Componentart, Inc.*, No. 02: 05CV1122, 2008 WL 4790661, at *19

(W.D. Pa. Oct. 27, 2008) (finding only *de minimis* showing of confusion based on volume of interactions with third parties, customers, and otherwise) (collecting additional cases).

Here, Axos Financial and its subsidiaries have been using the Axos Stylized X Marks since 2018, and Axos Clearing has been providing Axos Clearing's Good & Services under the Axos Stylized X Marks since 2019. (Facts 2, 15; Countercls. Exh. A.) Plaintiff's customer WiseBanyan also rebranded as Axos Invest in 2019. (Facts 3, 34.)

Neither party is aware of any actual confusion purportedly resulting from Defendants' use of the Axos Stylized X Marks. (Facts 44-45.) Plaintiff also did not conduct a likelihood of confusion survey in this case nor disclose an expert. (Fact 46.) Instead, in the beginning of 2020, Plaintiff ran an "experiment" with paid search advertisements, including "Axos" and "Axos Clearing," to see whether someone looking for "Axos" could confuse Axos for Plaintiff. (Fact 39.) It was a "poaching technique" to "bet on keywords to try to steal the traffic of when people search of [sic] those words." (*Id.*) As Plaintiff acknowledges, however, zero leads resulted from the experiment. (*Id.*) Based on this experiment, Plaintiff concluded that "the market was not confused" and stopped paying Google for "Axos" search terms because it had not generated traffic. (Fact 40.) For all of these reasons, the fourth and sixth *Lapp* factors favor Defendants.

### 6.    Defendants Acted in Good Faith

The fifth factor of the *Lapp* test, intent of Defendants, likewise weighs against a finding of likelihood of confusion. In order to show that a party acted in bad faith in adopting its mark, a plaintiff must present evidence showing, at a minimum, that the defendant chose its mark "with plaintiff's name or products in mind." *Checkpoint*, 269 F.3d at 286. The fact that a party was aware of the opposing party's mark before adopting its own mark, however, is not, without more, sufficient to establish bad faith. *See Freedom Card*, 432 F.3d at 480 (finding fact that defendant

16

was aware of plaintiff's mark prior to adopting its own mark insufficient to establish bad faith); *Int'l Data Grp.*,145 F. Supp. 2d at 438 ("[Defendant] clearly knew about CIO magazine at the nascent stages of CIO Insight and may have known about CIO Insider when it publicized its new product, but this is not enough to demonstrate bad faith or an intent to confuse").

Here, Axos Bank was originally formed as Bank of Internet USA in 2000 offering banking services.  (Fact 2.)  After a two-year rebrand exercise beginning in 2016 to consolidate several different brands and better reflect the diversity of its businesses, in September and October 2018, the holding company and bank adopted the name "Axos," which has no English meaning.  (*Id.*)  Around the same time, subsidiaries of Axos Financial began to offer a wider array of financial services beyond conventional banking.  (*Id.*)  The goal of the expansion was to evolve the banking experience by using technology to provide innovative products and services, which built on Axos Bank's existing businesses.  (Fact 3.)  In early 2019, Axos Financial acquired WiseBanyan, a financial advisory business, and COR Clearing, a clearing and custody firm.  (*Id.*)  Now part of the Axos Financial family of companies, these entities were rebranded as Axos Invest and Axos Clearing, respectively.  (*Id.*)  WiseBanyan was a client of Plaintiff and remained one after the rebrand to Axos Invest.  (Fact 34.)

The only Axos entity that has used the Stand-Alone Blue X Mark is Axos Invest.  (Fact 31.)  Axos Invest adopted the light blue color in the Stand-Alone Blue X Mark after Axos Financial acquired WiseBanyan because, prior to the acquisition, WiseBanyan had used that color in its logo and throughout its entire website, and keeping the color streamlined the rebrand effort.  (Fact 32.)

There has been no showing of any bad faith intent on the part of Defendants in adopting the Axos Stylized X Marks or the Stand-Alone Blue X Mark.  For these reasons, the fifth *Lapp* factor favors Defendants.

7.        **Balance of Factors Weighs in Favor of No Likelihood of Confusion**

As discussed in detail above, each of the *Lapp* factors weighs in favor of Defendants and against a finding of likelihood of confusion. *Bijur*, 332 F. Supp. at 732–33 (granting defendants' summary judgment motion after weighing *Lapp* factors); *Harp v. Rahme*, 984 F. Supp. 398, 420 (E.D. Pa. 2013), aff'd (Aug. 13, 2014) (same); *Kinbook, LLC v. Microsoft Corp.*, 866 F. Supp. 2d 453, 462–73 (E.D. Pa. 2012) (same); *see also Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 304 (3d Cir. 2001) (analyzing *Lapp* factors and affirming district court's finding of no likelihood of confusion and no Lanham Act violation).

C.        **Defendants are Entitled to Summary Judgment on the Issue of Actual Damages Because Plaintiff Has Not Identified Any Past or Present Monetary or Reputational Harm Suffered as a Result of Defendants' Use and Promotion of Defendants' Marks.**

Plaintiff purports to seek damages pursuant to 15 U.S.C. § 1117 and/or 6 *Del. C.* § 2533, but fails to establish its entitlement to such damages.[7]  15 U.S.C. § 1117 allows the Court, in its discretion, to award damages based upon either (i) Plaintiff's actual damages, or (ii) Defendants' profits.  *See* 15 U.S.C. § 1117(a).  An award of damages based upon a defendant's profits is "subject to principles of equity [and] turns on evidence of the defendant's sales and profit." *Covertech Fabricating, Inc. v. TVM Bldg. Prod., Inc.*, 855 F.3d 163, 176 (3d Cir. 2017).  Such an award is generally only available if a plaintiff presents evidence of "actual damage or actual profit in dollars and cents."  *See Caesars World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269, 274 (3d Cir. 1975).

---

[7] A claim for damages under the Lanham Act implicates the same analysis and requires the same evidentiary showing as does a claim for such damages pursuant to 6 *Del. C.* § 2533.  *See ACCU Pers., Inc. v. AccuStaff, Inc.*, 846 F. Supp. 1191, 1214 (D. Del. 1994) ("[T]he federal and state standards [for an award of profits or other enhanced damages] are substantially similar.").

Plaintiff has made no showing whatsoever of its actual damages and concedes it has none. Plaintiff has no knowledge of any actual damages as a result of Defendants' conduct. (Fact 47.) Plaintiff has suffered no lost sales, no loss of market share, and no loss of goodwill. (*Id*.) Plaintiff has done no corrective advertising to counter the alleged infringement. (*Id*.). Thus, Plaintiff has no claim for actual damages under either the Lanham Act or Delaware law, and so is certainly not entitled to enhanced or treble damages thereunder. *See ACCU Pers., Inc. v. AccuStaff, Inc.*, 846 F. Supp. 1191, 1215 (D. Del. 1994) ("Three times zero is zero.").

**D.    Defendants are Entitled to Summary Judgment on the Issue of Disgorgement Because Plaintiff Has Not Made A Preliminary Showing that Disgorgement is Warranted.**

Plaintiff fares no better if seeking damages based upon Defendants' profits. Plaintiff is not entitled to the equitable remedy of disgorgement where Plaintiff has no lost or diverted sales and therefore nothing to make whole. *See* 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30:59 (5th ed.) ("[A]n award of the trademark infringer's profits originated in the law as a way of compensating the plaintiff for sales lost to the infringer . . . when the parties are in competition with each other."). Nor has Plaintiff shown that Defendants were unjustly enriched. Finally, Plaintiff fails to set forth any evidence of bad faith intent by Defendants, *see* § B.6, *supra*, precluding any award of damages based upon a theory of "deterrence." [8]  For these reasons, Plaintiff has not made even a preliminary showing that it is entitled to disgorgement.

---

[8] Courts have occasionally allowed an award of profits where necessary to "deter" future infringement. An award of profits on this basis is only permissible, however, where a plaintiff demonstrates that the infringement was willful, *i.e.*, "consists of more than the accidental encroachment of another's rights [and] involves an intent to infringe or a deliberate disregard of a mark holder's rights." *Gucci Am., Inc. v. Daffy's Inc.*, 354 F.3d 228, 239 (3d Cir. 2003).

## **CONCLUSION**

For the reasons discussed above, Defendants respectfully request that summary judgment be entered in their favor on each of the claims in Plaintiff's First Amended Complaint and each of the counterclaims in Defendants' Answer to First Amended Complaint. In the event the Court finds that any of Plaintiff's claims should proceed to trial, Defendants are nevertheless entitled to summary judgment on the issue of actual damages and disgorgement, and requests that summary judgment be entered in their favor on these issues as well.

DATED: July 13, 2021

**OF COUNSEL:**

Ann K. Ford (admitted *Pro Hac Vice*)
John M. Nading (admitted *Pro Hac Vice*)
David M. Kramer (admitted *Pro Hac Vice*)
Devika Persaud (admitted *Pro Hac Vice*)
**DLA Piper LLP (US)**
500 Eighth Street, NW
Washington, D.C. 20004
Telephone: (202) 799-4000
Facsimile: (202) 799-5000
ann.ford@us.dlapiper.com
john.nading@us.dlapiper.com
david.kramer@us.dlapiper.com
devika.persaud@us.dlapiper.com

**DLA PIPER LLP (US)**

*/s/ Brian A. Biggs*
Brian A. Biggs (DE Bar No. 5591)
Kelly L. Freund (DE Bar No. 6280)
Erin E. Larson (DE Bar No. 6616)
1201 North Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
brian.biggs@us.dlapiper.com
kelly.freund@us.dlapiper.com
erin.larson@us.dlapiper.com

*Attorneys for Plaintiff Axos Bank* -and- *Attorneys for Defendants and Counterclaimants Axos Financial, Inc. and Axos Clearing LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I, Kelly L. Freund, do hereby certify that on this 13th day of July, 2021 a true and correct copy of: **DEFENDANTS AND COUNTERCLAIMANTS  AXOS FINANCIAL, INC. AND AXOS CLEARING LLC'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** was served on the following counsel of record vial electronic mail:

| | |
|---|---|
| Anne Shea Gaza | Patrick J. Arnold Jr. |
| Robert M. Vrana | Gregory C. Schodde |
| **YOUNG, CONAWAY, STARGATT** | Ronald H. Spuhler |
| **& TAYLOR LLP** | Bryce Persichetti |
| Rodney Square | **MCANDREWS, HELD & MALLOY,** |
| 1000 King Street | **LTD.** |
| Wilmington, DE 19801 | 500 West Madison Street, Suite 3400 |
| (302) 571-6600 | Chicago, Illinois 60661 |
| agaza@ycst.com | (312) 775-8000 |
| rvrana@ycst.com | parnold@mcandrews-ip.com |
| | gschodde@mcandrews-ip.com |
| | rspuhler@mcandrews-ip.com |
| | bpersichette@mcandrews-ip.com |

*/s/ Kelly L. Freund*
Kelly L. Freund

21